UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LISA O'CONNOR,

             Plaintiff,                          Case Number 05-10096
                                                               Honorable David M. Lawson

v.

PROVIDENT LIFE AND ACCIDENT COMPANY,

             Defendant.
_____/

**OPINION AND ORDER GRANTING DEFENDANT'S
MOTION TO AFFIRM PLAN ADMINISTRATOR'S DECISION
AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

The plaintiff, Lisa O'Connor, filed a complaint in this Court under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.*, to collect the unpaid portion of life insurance proceeds she claims are due under a policy of insurance issued on the life of her late husband, Michael O'Connor, through his employer, Morning Star Publishing Company. Morning Star offered group life insurance to its employees, with death benefits available in multiples of the employee's annual earnings. Mr. O'Connor elected a death benefit that was in excess of the multiple offered by the insurance underwriter, defendant Provident Life and Accident Company, although premiums for the amount elected were deducted from his paycheck. Provident paid a death benefit in the maximum amount offered to the employees, but the plaintiff seeks an award of the difference between the amount paid and the amount her husband had elected, contending that Provident either waived its approval requirements or it is equitably estopped from denying coverage, and therefore Provident's decision to deny benefits was arbitrary and capricious. The parties filed cross motions on the administrative record, and the Court heard oral argument on March 29, 2006. The Court now finds that neither waiver nor estoppel applies in this case, and the plaintiff is limited

to collecting the death benefit that Provident expressly (and not by implication) agreed to pay. Therefore, the Court will grant the defendant's motion to affirm the plan administrator and deny the plaintiff's motion for summary judgment.

I.

Michael O'Connor, the plaintiff's husband, worked for Morning Star Publishing Company from December 7, 2000 until his death on June 21, 2004 from Lou Gehrig's disease. Morning Star maintained a benefits plan that provided employees with, among other things, group life insurance and accidental death and dismemberment coverage. On October 24, 2002, O'Connor signed an enrollment form purporting to elect a "core" life insurance benefit for which his employer would bear the cost and optional coverage for which he would bear the additional cost. AR at 93. According to the election form, the benefits were to be provided through the defendant, Provident Life and Accident Company. The form O'Connor filled out read:

> Employee Life Insurance and Accidental Death & Dismemberment (UNUM/Provident)
> GROUP # 127085 – Division 2
>
> __X__ Core Benefit      100% EMPLOYER PAID – equals one times base annual earnings (includes bonuses and commissions averaged over past 24 months) to a maximum of $200,000. Guaranteed issue amount is $200,000. Amounts are rounded to the next higher $1000.
>
> __X__ Choose Option     Amounts to $250,000/Employee and $10,000 OR $20,000 Spouse coverage at the cost based on your age in the chart below. Guaranteed issue amount is the lesser of five times base annual earnings or $200,000 for employees and $20,000 for spouses.
>
> PLEASE CIRCLE YOUR CHOICE OF VOLUNTARY LIFE INSURANCE AND/OR DEPENDENT LIFE INSURANCE IN CHART BELOW

| EE | $20,000 | $40,000 | $60,000 | $80,000 | $100,000 | $150,000 | $200,000 | $250,000 | $10,000 | $20,000 |
|---|---|---|---|---|---|---|---|---|---|---|
| | Employee Coverage | Employee Coverage | Employee Coverage | Employee Coverage | Employee Coverage | Employee Coverage | Employee Coverage | Employee Coverage | Spouse Coverage | Spouse Coverage |
| . . . | . . . | . . . | . . . | . . . | . . . | . . . | . . . | . . . | . . . | . . . |
| 40-44 | $4.60 | $9.20 | $13.80 | $18.40 | $23.00 | $34.50 | $46.00 | $57.50 | $2.30 | $4.60 |

. . .

Beneficiary Designation

Primary
First  MI    Last                Relationship/Percentage       . . .
LISA  R.    O'CONNOR            Wife/ 100 %                    . . .

. . .

I hereby request coverage under the group life insurance policy issued by UNUM/Provident.  I understand that coverage under the group policy will not go into effect unless I am actively at work on or after the proposed effective date of coverage.  I hereby authorize my employer to deduct from my wages or salary the amount of contributions, if any, required for all coverages requested.  I further understand that if I refuse any benefit under the group policy, I may apply at a later date and I must submit evidence of insurability, such benefit will be effective on the date evidence of insurability is approved by UNUM/Provident.  I understand deductions are pre-tax.

/s Michael O'Connor

*Ibid.* (circled portion of form shown in highlighted text).

On June 18, 2003, the plaintiff once again completed a form to elect the "core" benefit and optional coverage on an enrollment form provided to him by Morning Star. AR at 96. He elected the same amount of optional coverage. The language of the form differed slightly from the one previously signed. It read:

Life Insurance and Accidental Death & Dismemberment (UNUM/Provident)

-3-

  X     Core Benefit - 100 % EMPLOYER PAID – equals one times base annual earnings (includes bonuses and commissions averaged over past 24 months) to a maximum of $200,000. . . .  Guaranteed issue amount is $200,000.  Amounts are rounded to the next higher $1,000.

AND

You may choose amounts up to $250,000 for yourself and $10,000 or $20,000 for your spouse.  The cost for spousal coverage is <u>based on the employee's age</u> in the chart below.  Combined Guaranteed Issue Amount is the lesser of five times your base annual earnings or $450,000 for employees ($200,000 Employer Paid Life Insurance/ $250,000 Voluntarily Life Insurance) and $20,000 for spouses.

  X     Yes, I would like to enroll in the voluntary life Insurance plan.  Please see my election circled below.
        No, I do not wish to enroll in the voluntary life insurance plan.

Please circle your choice of voluntary life insurance and/or dependent life insurance in the chart below.

| EE | $20,000 | $40,000 | $60,000 | $80,000 | $100,000 | $150,000 | $200,000 | $250,000 | $10,000 | $20,000 |
|---|---|---|---|---|---|---|---|---|---|---|
|  | Employee Coverage | Employee Coverage | Employee Coverage | Employee Coverage | Employee Coverage | Employee Coverage | Employee Coverage | Employee Coverage | Spouse Coverage | Spouse Coverage |
| . . . | . . . | . . . | . . . | . . . | . . . | . . . | . . . | . . . | . . . | . . . |
| 45-49 | $2.77 | $5.54 | $8.31 | $11.08 | $13.85 | $20.77 | $27.69 | $34.62 | . . . | . . . |

. . .

Please note: Benefit amounts chosen in excess of the Guaranteed Issue limit will not go into effect until underwritten approval by Unum/Provident.  Deductions will not begin for the <u>excess</u> amount until approval is received.
. . .

<u>Beneficiary Designation</u>

Primary
First   MI    Last                   Relationship/Percentage      . . .
<u>LISA   R.</u>     <u>O'CONNOR</u>         <u>Spouse/ 100 %</u>             . . .

. . .

I hereby request coverage under the group life insurance policy issued by UNUM/Provident.  I understand that coverage under the group policy will not go into effect unless I am actively at work on or after the proposed effective date of

>coverage. I hereby authorize my employer to deduct from my wages or salary the amount of contributions, if any, required for all coverages requested. I further understand that if I refuse any benefit under the group policy, I may apply at a later date and I must submit evidence of insurability, such benefit will be effective on the date evidence of insurability is approved by UNUM/Provident. I understand deductions for employee's life insurance are pre-tax, however, deductions for dependent Life Insurance are paid with after-tax dollars.
>
>/s Michael O'Connor

*Ibid.* (circled portion of form shown in highlighted text).

The defendant states that it did not draft or furnish these enrollment forms. Rather, it contends that the employer prepared the forms; the defendant did not approve the contents of the form. It is undisputed, however, that the employer deducted premium payments for $250,000 supplemental coverage from Michael O'Connor's paycheck and forwarded those payments to the defendant up until O'Connor's death.

As noted, Michael O'Connor died on June 21, 2004. According to the administrative record, Michael O'Connor suffered from amyotrophic lateral sclerosis (Lou Gehrig's Disease) for approximately nine years and cardiomyopathy for more than five years. The death certificate listed acute coronary syndrome as the immediate cause of death.

On July 2, 2004, Morning Star submitted a claim under the group life insurance policy on the plaintiff's behalf to the defendant in the amount of $273,000. On July 9, 2004, the defendant responded and assured the plaintiff that it would review the claim for benefits "promptly and efficiently." AR at 15. The defendant also assigned the claim an identifying number and encouraged the plaintiff to call if she had questions. On July 13, 2004, the defendant wrote a letter to the plaintiff stating that the claim was approved in the amount of $120,000; a portion was paid

to the funeral home for pre-approved expenses and the balance of $117,847.66 was deposited into a money market account in the plaintiff's name.

In response, the plaintiff hired attorney John Miller, who wrote a letter dated July 14, 2004 disagreeing with the settlement amount and requesting a copy of the insurance policy and other related documents. On July 23, 2004, the defendant completed its review of the plaintiff's claim and determined additional benefits of $153,000 (the difference between the $273,000 claimed and the $120,000 paid) were not owing under the policy. The defendant explained:

> The policy states that the insured can elect up to a combined maximum benefit for basic and optional life insurance of $450,000.00, not to exceed 5 times annual earnings. Michael elected optional life coverage of $250,000.00 and Morning Star Publishing Company provides a basic coverage of one times annual earning, rounded to the next higher $1,000. Michael's annual earnings with bonus were $23,850.00, with the rounding rule it equals $24,000.00. Therefore, Michael was able to elect up to 5 times his annual earnings . . . $120,000.00. The amount Michael elected exceeds the maximum coverage available under the policy, therefore no further benefits are payable.
>
> I am notifying 21st Century Newspapers, Inc./Morning Star Publishing Company to make any appropriate premium adjustments.
>
> Our action at this time is not a waiver of any and all other rights and defenses which our company may have under the provisions of these policies. In fact, specification of the foregoing grounds for denial shall not be exclusive. The company reserves all of its rights and waives none regarding this matter.

AR at 33. The letter also advised the plaintiff that she could appeal the decision in writing within ninety days.

The plaintiff, through counsel, wrote a letter informing the defendant that she wished to appeal the denial of benefits. In the letter, counsel argued that since the election form represented that premiums for the excess coverage would not be deducted until the underwriter approved the election, and premiums for a $150,000 death benefit had been deducted for two years before

Michael's death, the company was required to remit the full amount elected regardless of the limitation of five times annual earnings.  Counsel stated Mr. O'Connor relied on the apparent approval, insisting that "[h]ad you in fact told him that he was not eligible for that much insurance, Mr. O'Connor would have been able to go out and buy term insurance on his own."  AR at 40.  Counsel returned a check in the amount of $598, which apparently was sent by Morning Star as a refund of excess premium payments deducted from Michael O'Connor's paycheck every month.

The defendant denied the plaintiff's appeal on November 18, 2004 after further review.  The company relied on the language of the group life policy, which stated in part:

> BENEFIT,
>
> If you die while insured for employee life insurance, we will pay the benefit to your Beneficiary according to the terms of the Policy, after we receive satisfactory proof of death.
>
> . . .
>
> | | |
> |---|---|
> | BASIC EMPLOYEE LIFE INSURANCE | 1 times Annual Earnings, rounded to the next higher $1,000 |
> | OPTIONAL EMPLOYEE LIFE INSURANCE | Option of $10,000 to $250,000 in increments of $10,000 |
> | ANNUAL EARNINGS | Annual Earnings means base salary plus commissions and bonuses but excludes overtime pay, and other extra compensation received from the Employer.  Commissions are averaged over the past 24 months or over the period of employment if less than 24 months. |
> | MAXIMUM | Combined Maximum for Basic and Optional Life: $450,000, not to exceed 5 times Annual Earnings |

AR at 64-65.  The company also noted that death benefit amounts elected in excess of the guaranteed issue amounts required proof of insurability as a pre-condition of binding coverage, and Mr. O'Connor never furnished such proof.  The company insisted that the policy terms, not the

language on the election form, governed the parties' rights and obligations.  Once again, the defendant quoted portions of the group life policy, which state:

> EVIDENCE OF INSURABILITY REQUIREMENTS
>
> You are required to provide Evidence of Insurability when:
>
> 1. you apply for coverage under Late Enrollment:
> 2. you apply for coverage in excess of the Guaranteed Issue Amount:
> 3. your coverage under the Policy ends and you apply for reinstatement;
> 4. you were eligible but not covered under the Prior Plan; or
> 5. you were declined coverage under the Prior Plan.
>
> See Evidence of Insurability requirements in the section entitled Coverage Provisions.
>
> . . .
>
> EVIDENCE OF INSURABILITY
>
> You must complete the appropriate application form and submit the requested Evidence of Insurability when:
>
> 1.  you apply for insurance in excess of the Guaranteed Issue Limit;
> . . .
>
> The insurance will not go into effect unless we approve your Evidence of Insurability application.  If we approve your application, the insurance goes into effect on the latter of the first day of the calender month coinciding with or next following the date of approval, or the date you became eligible for insurance.

AR at 65, 49.  The letter informed the plaintiff that she could seek review of the denial under ERISA in the appropriate federal district court.

The plaintiff then filed suit in this Court on March 31, 2005.  Thereafter, the plaintiff filed a motion styled as a motion for summary judgment, but agreed at oral argument that it should be treated as a motion to reverse the determination of the defendant and for judgment on the administrative record.  The defendant filed a cross motion to affirm.

-8-

II.

Section 502(a)(1)(B) of ERISA authorizes an individual to bring an action "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The parties appear to agree that this Court should review the defendant's denial of benefits under the arbitrary and capricious standard, although the plaintiff believes the case is one of contract interpretation. This deferential review is appropriate when the ERISA-regulated plan at issue plainly grants discretion to the plan administrator and the decision being appealed was made in compliance with plan procedures. *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 595, 597 (6th Cir. 2001).

The Sixth Circuit has described the arbitrary and capricious standard of review as "the least demanding form of judicial review of administrative action. When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003) (internal quotes and citation omitted). When applying this standard, the court must determine whether the administrator's decision was reasonable in light of the available record evidence. In other words, if there is a reasonable explanation for the administrator's decision denying benefits in light of the plan's provisions, then the decision was neither arbitrary nor capricious. *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000). A decision reviewed according to this standard must be upheld if it is supported by "substantial evidence." *Baker v. United Mine Workers of Am. Health & Retirement Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991). Substantial evidence supports an administrator's decision if the evidence is "rational in light of the plan's provisions." *See Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997).

"[T]he validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of terms in the plan at issue." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). In such an action, the court generally considers only that evidence presented to the plan administrator at the time he or she determined the employee's eligibility in accordance with the plan's terms. *Smith*, 129 F.3d at 863. The court's review thus is limited to the administrative record. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 618 (6th Cir. 1998).

The plaintiff in this case argues that the defendant ought not be able to rely on the requirement of evidence of insurability for death benefits in excess of the guaranteed issue amounts. She reasons that the language of the policy implies that evidence of insurability will be requested by the defendant; but since the plaintiff never received any such request, the defendant waived any requirements of insurability. The plaintiff also argues that she and her late husband relied to their detriment on the fact that premiums for the $250,000 death benefit were deducted from his paycheck for several months, and therefore the defendant is equitably estopped from denying coverage in that amount. The Court will address each of these arguments in turn.

A.

The concept of waiver is derived from the common law of contracts. Although the Sixth Circuit has not formally recognized this claim in the ERISA context, that court has directed district courts to look to federal common law in interpreting plan provisions. *Univ. Hosp. of Cleveland v. South Lorain Merchants Ass'n Health*, 441 F.3d 430, 437 (6th Cir. 2006) (stating that "'[b]ecause the Plan is governed by ERISA, we apply federal common law rules of contract interpretation in making our determination.' . . . 'The general principles of contract law dictates that [this Court] interprets the Plan's provisions according to their plain meaning, in an ordinary and popular sense.'

. . . Based on this plain meaning analysis, this Court gives effect to the unambiguous terms of the contract") (quoting *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 556 (6th Cir.1998).

A panel of the Fifth Circuit has applied the concept of waiver to prevent an insurer from denying coverage in the ERISA context. *See Pitts v. American Sec. Life Ins. Co.*, 931 F.2d 351 (5th Cir. 1991). In that case, the plaintiff was insured under a group health policy purchased by him employer that required each group to have at least ten members. Due to business difficulties, employees left the company, eventually leaving only the plaintiff insured under the group health policy. The plaintiff had since incurred a serious illness, which resulted in significant medical expenses that the defendant paid, even after it had discovered that the size of the group had shrunk below the threshold required by the policy. The court stated that "[w]aiver is the voluntary or intentional relinquishment of a known right." *Id.* at 357 (citing *General Elec. Supply Co. v. Utley-James of Texas, Inc.*, 857 F.2d 1010, 1013 n.1 (5th Cir.1988), and 16B Appleman, Insurance Law and Practice, § 9086, at 536-39 (1981)). The court held that by accepting premiums and paying medical expenses after it had learned of the diminished group size, the insurer waived its right to assert the breach of the policy condition as a defense to coverage.

Two other circuits have discussed the concept of waiver in the ERISA context without actually adopting it as part of the federal common law. In *Thomason v. Aetna Life Ins. Co.*, 9 F.3d 645 (7th Cir. 1993), the court declined to apply waiver to bar an insurer from denying coverage under a group policy when it had mistakenly notified the insured that the coverage on his life insurance policy was extended without cost to him after he suffered a disabling illness and could no longer work. The court observed that before an express waiver may be found, "some courts require that the waiving party has received consideration for the waiver or that the non-waiving party has

acted in reasonable reliance on the apparent waiver." *Id.* at 648. The court also noted that "[o]ther courts hold, especially in the insurance context, that an implied waiver can be found without any detrimental reliance or exchange of consideration," although in such circumstances "the waiving party has usually received some benefit, although perhaps not 'consideration,' which militates in favor of finding a valid waiver." *Id.* at 648 & n.3. The court then held:

> In this case plaintiff concedes that she cannot establish any sort of detrimental reliance on the misleading letters that Aetna sent. Nor did she give Aetna consideration for the alleged waiver. The waiver that plaintiff seeks, then, is a something-for-nothing kind of waiver whereby Aetna will be held to the terms of its misleading representations for no reason other than that it made them. This Court will not apply such waiver principles to ERISA actions.

*Id.* at 648-49.

In *Glass v. United of Omaha Life Ins. Co.*, 33 F.3d 1341 (11th Cir. 1994), the decedent was on disability at the time the defendant's group life insurance went into effect. The decedent purchased basic and optional coverage, and the defendant initially accepted his premium payments; it even converted the group policy to a permanent one when the decedent's employment was terminated due to his illness. However, the decedent was never eligible for the group coverage because he did not work the minimum required hours each week when he enrolled. The defendant paid the decedent's medical expenses under the health portion of the policy but it refused to pay the death benefit. The plaintiff argued that the defendant waived the eligibility requirement when it accepted the premiums on the life portion of the policy. The Eleventh Circuit disagreed. It adopted the reasoning of *Thompson*, and held that because the administrative record failed to show that the defendant did not know "beyond doubt" that the decedent was not actively at work when he applied for the life coverage, waiver was not shown. The court explained:

>we leave open whether in other circumstances waiver principles might apply under the federal common law in the ERISA context. However, we reject plaintiff's waiver argument under the circumstances of this case. We conclude that plaintiff has adduced insufficient evidence either of intentional relinquishment of a known right or of any unjust benefit circumstance. . . . Although [the defendant] accepted some premiums during the investigation and resolution of the problem, there is no evidence that [it] attempted to unjustly enrich itself at the expense of an ineligible plan participant. Based on the circumstances in this case . . . we decline to incorporate as part of the federal common law of ERISA a "something-for-nothing" waiver claim like [the plaintiff] urges in this case. The record is clear that [the defendant] did not knowingly and intentionally waive the eligibility requirements of its plan.

*Id.* at 1348-49 (footnote omitted).

In considering waiver, these three cases uniformly apply the requirement that the party seeking to benefit from the waiver argument prove that the other party was aware of the facts and chose not to assert the ineligibility at the time premiums were accepted. In this case, there is no dispute that the group policy plainly states that the maximum guaranteed death benefit may not exceed five times the employee's earnings, additional insurance was offered only if evidence of insurability were furnished, and Mr. O'Connor never furnished such evidence to the defendant. The parties also agree that the enrollment form stated that premiums would not be deducted from the employee's paycheck unless the coverage was approved. However, the evidence in the administrative record does not support the notion that the defendant was aware that Mr. O'Connor had applied for coverage that required proof of insurability and waived that requirement. Certainly, someone made an error: either the employer made a mistake in deducting the premium payments without receiving approval, or the defendant received the premiums and simply forgot to insist on evidence of insurability. But there is no evidence that the defendant was aware of the amount of the plaintiff's annual earnings and therefore could not know that the amount of coverage he elected exceeded five times those earnings. A receipt of premiums without explanation from the employer

in this case may have appeared to the defendant as a part of normal receipts under the terms of the group life insurance policy. *See* AR, Ex. 2, Policy Amendment # 20 at 2 (stating "[e]mployees pay 100% of the cost of this insurance"). There is no evidence that the defendant was attempting to reap an unjust benefit by extracting premiums from the decedent when it knew it had a defense to coverage and waited until a claim was made before cancelling the excess coverage amount. Because the plaintiff has failed to demonstrate from evidence in the record that the defendant knew that the decedent applied for coverage beyond the amount offered as guaranteed issue and relinquished its right to demand proof of insurability, the defendant did not act arbitrarily or capriciously in denying the claim for the death benefit beyond $120,000.

B.

The Sixth Circuit recently reiterated the elements of a claim of equitable or promissory estoppel, which has been recognized as "a viable theory in ERISA welfare benefit actions":

> (1) there must be conduct or language amounting to a representation of material fact; (2) the party to be estopped must be aware of the true facts; (3) the party to be estopped must intend that the representation be acted on, or the party asserting the estoppel must reasonably believe that the party to be estopped so intends; (4) the party asserting the estoppel must be unaware of the true facts; and (5) the party asserting the estoppel must reasonably or justifiably rely on the representation to his detriment.

*Moore v. LaFayette Life Ins. Co.*, 458 F.3d 416, 428-29 (6th Cir. 2006) (quoting *Sprague v. Gen. Motors, Inc.*, 133 F.3d 388, 403 (6th Cir.1998)); *see also Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444 (6th Cir. 2003). The court emphasized that "[p]laintiffs cannot recover under an estoppel theory for misrepresentations which contradict unambiguous, written plan terms because their reliance on the subsequent representation would be unreasonable." *Moore*, 458 F.3d at 429.

-14-

The plaintiff argues that the defendant misrepresented the fact that the insurer approved the excess coverage election by accepting and retaining premiums for a two-year period. The plaintiff says that she and her late husband detrimentally relied on that misrepresentation by not seeking other life insurance.

The Court believes that the evidence plainly shows a representation of material fact in that the enrollment form represented that the employer would not deduct premiums unless approval from the defendant had been received. AR at 96 (stating that "[b]enefit amounts chosen in excess of the Guaranteed Issue limit will not go into effect until underwritten approval by Unum/Provident. Deductions will not begin for the excess amount until approval is received"). The defendant disavows responsibility for the form, but it must bear some responsibility for communicating accurate information to plan participants since it had discretionary authority in administering the life insurance provisions of the plan. *See* 29 U.S.C. § 1002(21)(A) (defining a plan fiduciary as anyone who has discretionary authority or responsibility "respecting management of such plan," "disposition of its assets," or "administration of such plan"). "A fiduciary breaches his duty by providing plan participants with materially misleading information, 'regardless of whether the fiduciary's statements or omissions were made negligently or intentionally.'" *Moore*, 458 F.3d at 432 (quoting *Krohn v. Huron Mem. Hosp'l*, 173 F.3d 542, 547 (6th Cir.1999)). The defendant in this case, therefore, is accountable for the misinformation.

Despite this misrepresentation, however, the administrative record does not demonstrate that the defendant was aware of the true facts, it intended the plaintiff or her husband to act on the misrepresentation, or the plaintiff justifiably relied on the misrepresentation to her detriment. As noted above, there is no reason to conclude that the defendant understood Mr. O'Connor's election

of $250,000 in death benefits to have exceeded five times his earnings, and therefore it did not know at the time that the amount selected was more than guaranteed issue amounts offered by the defendant. Certainly, there is no reason to conclude that the defendant sought to prevent or discourage the O'Connors from obtaining life insurance from other sources. The second and third elements of the estoppel claim have not been established.

Nor is there an adequate showing on the element of detrimental reliance. Because of the plaint language in the policy and the enrollment form, Mr. O'Connor could not have believed reasonably that he could obtain guaranteed issue life insurance in an amount of death benefits that exceeded five times his earnings. There is no ambiguity in that limitation. The circumstances likely created some confusion when premiums for the full amount elected were regularly deducted from Mr. O'Connor's paycheck, but the limitation in the plan documents remained clear. The Sixth Circuit has held that an estoppel claim will provide a plan participant no relief, because "[w]hen a party seeks to estop the application of an unambiguous plan provision, he by necessity argues that he reasonably and justifiably relied on a representation that was inconsistent with the clear terms of the plan." *Marks*, 342 F.3d at 456. Therefore, the court of appeals has held that "[a] party cannot seek to estop the application of an unambiguous written provision in an ERISA plan." *Ibid.*

In addition, there is no evidence that Mr. O'Connor actually was discouraged from obtaining other life insurance, or that he could have. Tragically, Mr. O'Connor had contracted a fatal disease nine years before his death and approximately seven years before he made his initial coverage election through Morning Star. Based on that information, it would have been reasonable for the plan administrator to conclude that Mr. O'Connor could not have furnished evidence of insurability to Provident or any other insurer, and therefore that there could be no detrimental reliance on the

-16-

mistake in this case that resulted in foregoing an opportunity for additional coverage through another insurer. Such a conclusion is neither arbitrary nor capricious.

III.

The Court finds that there is a reasonable explanation for the administrator's decision to deny benefits in this case in light of the plan's provisions and the evidence contained in the administrative record.

Accordingly, it is **ORDERED** that the defendant's motion to affirm the plan administrator's decision [dkt #13] is **GRANTED**.

It is further **ORDERED** that the plaintiff's motion for summary judgment, construed as a motion to reverse the plan administrator's decision and award benefits [dkt #15] is **DENIED**, and the plaintiff's complaint is **DISMISSED WITH PREJUDICE**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: September 25, 2006

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 25, 2006.

s/Felicia Moses
Case Manager

---